IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| GREGORY HADDAD, | ) |
| Plaintiff, | ) |
| v. | ) |
| BAC HOME LOANS SERVICING, LLP, and BANK OF AMERICA, N.A., | ) |
| Defendants. | ) |

## INTRODUCTION

Within the most recent decade, the mortgage crisis has become all too familiar in this country. The Plaintiff's claims in this action are even more appalling considering the national time, effort, and money that have been engaged in attempting to end the crisis. This is especially true when the financial institution involved is acting under the aegis of a federal program specifically targeted at preventing foreclosure.

In October of 2008, Bank of America accepted $15 billion in funds from the United States Government as part of the Troubled Asset Relief Program ("TARP"), 12 U.S.C. § 5211. In January of 2009, in connection with its acquisition of Merrill Lynch, Bank of America accepted another $10 billion in TARP funds, as well as a partial guarantee against losses on $118 billion in mortgage-related assets. In April of 2009, Bank of America signed a contract with the U.S. Treasury agreeing to participate in HAMP – a program in which BAC, as the servicing arm of Bank of America, received incentive payments for providing affordable mortgage loan modifications and other alternatives to foreclosure to eligible borrowers.

## JURISDICTION AND VENUE

Plaintiff invokes the jurisdiction of this Court pursuant to 28 U.S.C. § 1332 because this action is between parties that are citizens of different states and the amount in controversy is greater than $75,000.00. For diversity jurisdiction purposes, a national bank is a citizen of the state designated as its main office on its organization certificate. Wachovia Bank, N.A. v. Schmidt, 546 U.S. 303, 306 (2006). Bank of America, NA is, upon information and belief, a citizen of North Carolina. Plaintiff is a citizen of Massachusetts.

1

Venue is proper in this Court pursuant to 28 U.S.C. 1391(b) inasmuch as the unlawful practices are alleged to have been committed in this District, Defendant regularly conducts business in this District, and the named Plaintiff resides in this District.

## PARTIES

### A. Plaintiff

Gregory Haddad is a natural person residing at 20 West Street in Auburn, Massachusetts 01501.

### B. Mortgage Lender Defendant

Bank of America, N.A. is a national bank and mortgage lender with principal place of business and headquarters located at 101 Tryon Street, Charlotte, North Carolina 28255. Bank of America, N.A. either directly and/or indirectly through its agents, including but not limited to BAC Home Loans Servicing, LP, held, serviced and/or engaged in transactions related to mortgages of real property within the Commonwealth of Massachusetts.

### C. Mortgage Servicer Defendant

BAC Home Loans Servicing, LP is a subsidiary of Bank of America, N.A., located at 4500 Park Granada, Calabasas, California 91302. BAC Home Loans Servicing, LP is a limited partnership organized under the laws of Texas. From April 2009 through July 6, 2011, it was registered as a foreign limited partnership with the Secretary of the Commonwealth of Massachusetts. Prior to April 2009, BAC Home Loans Servicing, LP did business under the name Countrywide Home Loans Servicing, LP.

## FACTS

### A. History of TARP

Congress passed the Emergency Economic Stabilization Act of 2008 on October 3, 2008 and amended it with the American Recovery and Reinvestment Act of 2009 on February 17, 2009 (together, the "Act"). 12 U.S.C.A. §5201 et. seq. (2009). The purpose of the Act is to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system, and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership."12 U.S.C.A. §5201.

The Act grants the Secretary of the Treasury the authority to establish the Troubled Asset Relief Program, or TARP. 12 U.S.C. § 5211. Under TARP, the Secretary may purchase or make commitments to purchase troubled assets from financial institutions. Id. Congress allocated up to $700 billion to the United States Department of the Treasury for TARP. 12 U.S.C. § 5225.

In exercising its authority to administer TARP, the Act mandates that the Secretary "shall" take into consideration the "need to help families keep their homes and to stabilize communities." 12 U.S.C. § 5213(3). The Act further mandates, with regard to any assets acquired by the Secretary that are backed by residential real estate, that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners" and use the Secretary's

2

authority over servicers to encourage them to take advantage of programs to "minimize foreclosures." 12 U.S.C. §5219. The Act grants authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures." Id.

The Act imposes parallel mandates to implement plans to maximize assistance to homeowners and to minimize foreclosures on the Federal Housing Finance Agency, Federal National Mortgage Association ("Fannie Mae"), Federal Home Loan Mortgage Corporation ("Freddie Mac"), and the Federal Reserve Board in their roles as "Federal property managers." 12 U.S.C. §5220.

## B. History of HAMP

On February 18, 2009, pursuant to their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the Making Home Affordable program. The Making Home Affordable program consists of two sub-programs. The first sub-program relates to the creation of refinancing products for individuals with minimal or negative equity in their home, and is now known as the Home Affordable Refinance Program, or HARP.

The second sub-program relates to the creation and implementation of a uniform loan modification protocol, and is now known as the Home Affordable Modification Program, or HAMP. It is this sub-program that is at issue in this case.

HAMP is funded by the federal government, primarily with TARP funds. The Treasury Department has allocated at least $75 billion to HAMP, of which at least $50 billion is TARP money. Under HAMP, the federal government incentivizes participating servicers to enter into agreements with struggling homeowners that will make adjustments to the existing mortgage obligations in order to make the monthly payments more affordable. Servicers receive $1,000.00 for each HAMP modification.

While courts have determined there is no private right of action under HAMP, a violation that is deceptive or unfair could create a viable claim for relief under Chapter 93A. See Bosque v. Wells Fargo Bank, N.A., No. 10-10311, 2011 WL 304725, at *7-*8 (D. Mass. Jan. 26, 2011) (denying motion to dismiss Chapter 93A claim arising out of HAMP application); cf. Speleos v. BAC Home Loans Servicing, L.P., No. 10-11503, 2010 WL 5174510, at *6 (D. Mass. Dec. 14, 2010) (stating, with regard to HAMP, that "a claim for negligence based on a statutory or regulatory violation can survive even where there is no private cause of action under that statute or regulation.").

## C. Loan Servicers

The industry entities that perform the actual interface with borrowers -- including such tasks as payment processing, escrow maintenance, loss mitigation and foreclosure -- are known as "servicers." Servicers typically act as the agents of the entities that hold mortgage loans. BAC Home Loans Servicing, LP is a servicing business operated by Bank of America, N.A. and its actions described herein were made as agents for the entities that hold mortgage loans. Should a servicer *elect to participate* in HAMP they execute a Servicer Participation Agreement ("SPA") with the federal government.

3

Certain classes of loans, namely those held by Fannie Mae, Freddie Mac or companies that accepted money under the TARP program are subject to mandatory inclusion in HAMP. Otherwise, participation by servicers in the HAMP program is voluntary.

Massachusetts recognizes that "a duty voluntarily assumed must be performed with due care," and have approved the principles pertaining to voluntary assumption of a duty as set forth in the Restatement (Second) of Torts § 323 (1965). Mullins v. Pine Manor College, 389 Mass. 47, 52, 53 (1983). "If a person voluntarily assumes a duty or undertakes to render services to another that should have been seen as necessary for her protection, that person may be liable for harm caused because of the negligent performance of his undertaking." Thorson v. Mandell, 402 Mass. 744, 748 (1988).

On April 19, 2009, Steve R. Bailey, Senior Vice President of Bank of America, N.A. executed an SPA, thereby making BAC a participating servicer in HAMP.

In or around October 2010, evidence began to sprout regarding numerous national banks, including Bank of America, failures to comply with the strict requirements of the affidavit and notary procedures required under Massachusetts law. Proceedings in state and bankruptcy courts as well as filings with various registries of deeds revealed the pervasive use of mortgage servicer employees to sign affidavits and other sworn statements without any personal knowledge of the information contained in the affidavits, without any verification by the notary as to the affiant's identity and without the affiant even being present.

Evidence has since indicated that these practices occurred in the context of foreclosures and documents concerning the creation, assignment, transfer and modification of mortgages secured by property in Massachusetts. The private and public knowledge of these issues, including numerous lawsuits, have been widely disseminated and yet, upon information and belief, continue in some regards.

**D. Facts Specific to Plaintiff Haddad**

On or about July 24, 1995, Haddad purchased the property known as 20 West Street in Auburn, Massachusetts 01501 ("the Subject Property").

On or about February 8, 2006, Haddad mortgaged the Subject Property with Countrywide Home Loans, Inc.

In or about July of 2008, Bank of America purchased Countrywide Home Loans, Inc., including Haddad's mortgage on the Subject Property. From July of 2008 through the present, numerous transfers occurred regarding the rights to the mortgage on the Subject Property, including but not limited to, involvement by Mortgage Electronic Registration Systems, Inc. and U.S. Bank National Association.

Haddad was divorced in 2007 and, in addition to the additional costs therein and the rise in costs of the necessary expenses for the survival of his family, Haddad initiated contact with BOA for much-needed mortgage assistance.

Despite Haddad's loan not being owned by Fannie Mae, BOA voluntarily agreed to work with Haddad on a homeowners assistance program, including, but not limited to, the HAMP program, and, beginning a pattern that would continue to the present, Haddad was met with

4

promises of assistance. However, throughout the next five years, Haddad has yet to actually receive any.

Due to these initial difficulties and the inability to receive any mortgage assistance, Haddad was forced to file for relief under Chapter 7 of the Bankruptcy Code in order to retain his family home.

Still not receiving any requested aid despite ongoing assurances thereof, yet still attempting to continue a mutually beneficial relationship with BOA, Haddad hired counsel and filed another request for a BOA In-House or HAMP loan modification on or about May of 2010.

Throughout Haddad's long and painful relationship with BOA, packages and documentation have been submitted via U.S. Postal Mail, facsimile, email, and through the Default Mitigation Management Webportal.

Rather than receive substantial updates or even requests for substantive updated documents, Haddad and his counsel received only notices of "assignments" regarding his file, requests for additional documents, including documents recently provided, and notices of denial based on erroneous reasons. Despite these and additional inconsequential updates received via Haddad's counsel, on or about May 16, 2011, Haddad received notice regarding a possible deal being sent.

However, on or about May 19, 2011, Haddad's counsel received a call requesting documents previously sent, with no further information regarding the possible modification offer. Subsequently, Haddad's counsel received a message requesting further information, leaving yet another separate number. According to the voice mail service, said call and message was left at 7:34 p.m. EST.

Despite responding to these requests, Haddad and his counsel continued to check with BOA on numerous occasions regarding both the status of the alleged offer and the present status of his pending application for a HAMP or a BOA In-House loan modification.

Rather than receiving substantive responses, Haddad's counsel was repeatedly told the file was closed, that there were no agreements, that documents were received and nothing was needed at that time, that documents were never received (despite previous verification of receipt), and that requests had never been made for assistance, as well as continuing to receive disconnected phone numbers.

Continuing on despite numerous requests for follow ups on the alleged offer, no further information on the alleged agreement has since been received, while Haddad has continued to receive documents and other communications nearly universally containing phrases expressing BOA's desire to assist Haddad (e.g. "We're here to help you.").

Therefore, Haddad further filed, in addition to the previously filed complete packages and updated documents, complete new packages on numerous occasions, including carbon copying BOA's present foreclosure attorneys, Orlans Moran. Further calls, emails, and faxes, requesting status updates and sending updated documents, only resulted in notices stating the file was "under review" and assigned to associates (e.g. Isaac Cole (Cole, Isaac <isaac.cole@bankofamerica.com>) and Jacob Lowder <jacob.lowder@bankofamerica.com>), who all later seemingly disappeared altogether without any further updates and without having seemingly passed on any information to further assigned "Workout Specialists". Despite the

5

seemingly constant transfers, Haddad's counsel was often referred to "Workout Specialists" that were no longer with BOA.

Haddad and his counsel continued to file updated documents, including complete new packages requesting modification assistance. On or about November 3 of 2011, Haddad's counsel was informed that Haddad's account was assigned to Vanessa Thomas.

Given the previous lack of response and erroneous documentation received from BOA that Haddad's file had been denied due to incorrect information that Haddad did not reside at the subject property (despite previous requested documentation showing proof of occupancy submitted), Haddad's counsel spoke to a representative of BOA on or after November 3 of 2011, who once again acknowledged the mistake, including the same problem with the second mortgage with BOA previously discussed, claiming BOA would review the information, look into the problem, and come to some resolution.

During this period, Haddad's counsel left in excess of ten voice mail messages for Thomas and her supervisors, not including messages to Shameka Ballard, who was the apparent "liaison" for Haddad's account. While Shameka did respond to Haddad's counsel's calls on most occasions, reference was usually given to Thomas's handling of the account, and no substantive updates were received.

On a number of occasions during this period, Shameka would agree that there had been unusual delays and occurrences on this file, followed by promises of "looking into" and returning calls with an update. Once again, however, nothing was heard from BOA. Numerous messages were left regarding Haddad's account with no responses from any representative of BOA.

In fairness, despite BOA's general lack of response, for a time, Shameka did return calls, usually deferring to other BOA "parties" (usually Thomas's) knowledge for updates. During this period, there was a minimum of ten (10) messages left for Vanessa Thomas and her supervisors regarding Haddad's account, at least 9 of which were never responded to. The one response that was received was while Haddad's counsel was on the phone with Thomas's supervisor. While on said call, just after receiving notice that the supervisor sent some message to Thomas, Haddad's counsel saw another phone line ringing, and, expecting such action from BOA, answered the call.

The only "substantive" updates ever received were general statements that the file was "in review", or "forwarded to underwriting", with "no documents needed". During this period additional requests were made, although no response was further given regarding the previous alleged offer made to Haddad. Haddad, through this counsel, continued to file updated paystubs, bank statements and utility bills and other requested documents. Furthermore, Haddad continued to receive nearly periodic packages from Bank of America exclaiming their desire to assist with this mortgage, often requesting Haddad file a request for a modification package.

Although there are numerous specific examples showing the treatment Haddad has suffered through at the hands of BOA, the following chronology is highly illustrative:

On March 9, 2012, Haddad's counsel contacted BOA, leaving a message for Vanessa Thomas of the BOA Advocacy Department, and then speaking to Shameka Ballad of the BOA Home Loan Team. Haddad's counsel was informed again that Haddad's file was in underwriting, and, once again, Shameka acknowledged the delay, stating that although

6

she usually "cannot make outgoing calls," she would call back in three to five days with an update. Seven days later, after not receiving any updates, Haddad's counsel once again left a voice mail message for Thomas, and, when attempting to reach Shameka, was consistently disconnected before being able to leave a message. After leaving numerous more messages, Haddad's counsel was eventually able to speak with Shameka again, on March 27, 2012, where he was informed, once again, that Haddad's file was still in underwriting and no additional documents were needed. Then, on or about April 11, 2012, Haddad received a letter apparently signed by Shameka Ballard, dated April 9, 2012 and stating that "[a]fter careful review, we are unable to approve your request for a home modification at this time." The reason given for said denial was: "Request Incomplete: You are not eligible for a modification of your home equity loan because you did not provide us with the documents we requested. A letter listing the specific documents we needed and timeframe required to provide them was sent to you more than 30 days ago."

In addition to the conversations with BOA by Haddad's counsel wherein no requests were made, neither Haddad nor his counsel received any such letters. Furthermore, after leaving numerous more unreturned messages, Haddad's counsel was finally able to reach BOA, wherein it was confirmed no documents were requested or needed at this point. Written confirmation of this fact was received by Haddad's counsel from Vanessa Thomas.

In conclusion, during a period of nearly six years, Haddad, with and without assistance of counsel, has continued to file numerous updates and packages as requested by agents or servicers thereof of BOA, has faced the near constant threat of foreclosure and debt collection harassment, and put through the ringer while continually looking for assistance from BOA.

Due to the actions of BOA and its agents, Haddad has suffered significant damages, including but not limited to, embarrassment and shock, undue stress, attorneys fees, as well as the costs and fees related to his near constant dealings with BOA.

On June 4, 2012, a Demand Letter under M.G.L. c. 93A was sent to Bank of America and its present President and CEO, including exhibits showing the above facts. In substance, Plaintiff states no response was made, notwithstanding the following:

a. Plaintiff's Counsel received a call from "Asia from the Bank of America Corporate Office"; for which Plaintiff's counsel returned said call and was informed additional authorizations were needed in order to speak with said counsel.
b. Despite having sent over three previous authorizations that had been confirmed as received and accepted, Plaintiff's counsel sent yet another round of authorizations to BOA.
c. Plaintiff's counsel contacted Asia at the corporate office yet again, when he was informed that documents to resolve said problem had been sent.
d. Plaintiff's counsel contacted Asia once again as the corporate office as nothing had been received, was once informed that a mistake had been made, and said documents would be sent.
e. Despite two more calls to Asia at the corporate office, nothing has been received by Haddad or his counsel.

Therefore, Plaintiff states no response was made to Plaintiff's Demand Letter.

7

## COUNT I

### Unfair or Deceptive Acts or Practices in Violation of G.L. c. 93A

1. The allegations contained in the foregoing paragraphs are incorporated and re-alleged herein by reference.

2. By engaging in the servicing practices described above, BOA and its agents, engaged in unfair and deceptive acts and practices in violation of M.G.L. c. 93A, and regulations promulgated thereunder.

3. As a direct and proximate result of these deceptive acts and practices, Defendants have caused the Plaintiff increased fees and costs in his attempts to avoid foreclosure; loss of savings in fruitless attempts to secure loan modifications; loss of opportunities to pursue other refinancing or loss mitigation strategies; and significant stress and emotional distress. 4. Haddad's counsel sent a 93A letter to BOA on June 4, 2012 that has received no response.

## COUNT II

### Violations for the Fair Debt Collections Practices Act, 15 U.S.C. § 1692 et. seq.

1. The allegations contained in the foregoing paragraphs are incorporated and re-alleged herein by reference.

2. BOA used deceptive and unfair debt collection practices in relation to the collection of Plaintiff's mortgage debt.

3. Other, less deceptive, methods of collection practices were and are available to the Plaintiff.

4. As a direct and proximate result of these unfair and deceptive debt collection practices, Defendants have caused the Plaintiff increased fees and costs in his attempts to avoid foreclosure; loss of savings in fruitless attempts to secure loan modifications; loss of opportunities to pursue other refinancing or loss mitigation strategies; and significant stress and emotional distress.

## COUNT III

### Violations of the Truth in Lending Act

1. The allegations contained in the foregoing paragraphs are incorporated and re-alleged herein by reference.

2. Upon information and belief, Plaintiff believes through production of documents and other things, violations of the Truth In Lending Act will be uncovered.

3. These violations of the Truth in Lending Act have caused the Plaintiff increased fees and costs in his attempts to avoid foreclosure; loss of savings in fruitless attempts to secure loan modifications; loss of opportunities to pursue other refinancing or loss mitigation strategies; and significant stress and emotional distress.

8

## COUNT IV

### Breach of the Implied Covenant of Good Faith and Fair Dealing

1. The allegations contained in the foregoing paragraphs are incorporated and re-alleged herein by reference.

2. Defendant is by common law to act in good faith and to deal fairly with each borrower.

3. Defendant routinely and regularly breaches this duty by:

    a. failing to perform loan servicing functions consistent with its responsibilities to Plaintiffs;

    b. failing to properly supervise its agents and employees including, without limitation, its loss mitigation and collection personnel and its foreclosure

    attorneys;

    c. routinely demanding information already in its files;

    d. making inaccurate calculations and determinations of Plaintiffs' eligibility for HAMP;

    e. failing to follow through on written and implied promises and statements;

    f. failing to follow through on contractual obligations; and

    g. failing to give permanent HAMP modifications and other foreclosure alternatives.

4. As a result of these failures to act in good faith and the absence of fair dealing, Defendants have caused the Plaintiff increased fees and costs in his attempts to avoid foreclosure; loss of savings in fruitless attempts to secure loan modifications; loss of opportunities to pursue other refinancing or loss mitigation strategies; and significant stress and emotional distress..

## COUNT V

### Intentional Infliction of Emotional Distress

1. The allegations contained in the foregoing paragraphs are incorporated and re-alleged herein by reference.

2. The Defendants or their agents knowingly or should have known that their actions towards the Plaintiff would cause him severe emotional distress.

3. A reasonable person would not be expected to bear the extent of the emotional distress.

## COUNT VI

### Violation of the Massachusetts Consumer Protection Act and Applicable Regulations

1. The allegations contained in the foregoing paragraphs are incorporated and re-alleged herein by reference.

9

2. Defendant has violated and continues to violate the Massachusetts Consumer Protection Act, G.L. c. 93A, §2 and applicable regulations promulgated by the Massachusetts Attorney General pursuant to G.L. c. 93A, §2(c) including, without limitation:

a. 940 C.M.R. § 3.16, in that its conduct was unfair, deceptive, oppressive, unconscionable, and contrary to public policy and generally recognized standards applicable to the consumer lending business;

b. 940 C.M.R. § 3.16, in that its conduct violated the requirement of good faith and fair dealing applicable to contracts under G.L. c. 106, §1-203;

c. 940 C.M.R. § 3.16, in that its conduct violated existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety or welfare, as detailed below;

d. 940 C.M.R. § 3.05, in that it made deceptive representations or failed to disclose relevant information as to loan modifications offered to the Plaintiff;

e. 940 C.M.R. § 8.06, in that it is a Mortgage Lender and made false or misleading representations to borrowers; and

f. 940 C.M.R. § 25.03, because it offers Foreclosure-related Services within the meaning of 940 C.M.R. § 25.01 without adequately describing the services offered.

3. Defendants' violations have caused the Plaintiff increased fees and costs in his attempts to avoid foreclosure; loss of savings in fruitless attempts to secure loan modifications; loss of opportunities to pursue other refinancing or loss mitigation strategies; and significant stress and emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request the following relief:

a. Enter a judgment declaring the acts and practices of Defendant complained of herein to constitute a breach of contract and a breach of the covenant of good faith and fair dealing, as well as a declaration that they are required by the doctrine of promissory estoppel to offer a permanent modifications to the Plaintiff on the terms agreeable to all parties;

c. Grant a permanent or final injunction enjoining Defendant's agents and employees, affiliates and subsidiaries, from continuing to harm Plaintiff;

f. Award actual and/or statutory minimum damages pursuant to M.G.L. c. 93A § 9(3) to the Plaintiff;

g. Award multiple damages pursuant to M.G.L. c. 93A § 9(3) to the Plaintiffs and

the class;

i. Grant Plaintiff such other and further relief as this Court finds necessary and proper.

Respectfully Submitted,
GREGORY HADDAD,
By His Attorney,

Michelle M. Baratta
BBO# 677022
FLANAGAN AND ASSOCIATES, LLC
440 Washington Street, Ste 4
Weymouth, MA 02189
617.472.8400
Michelle@flanaganandassociates.com

Dated: November 7, 2012

11